Good morning. We're ready to call our first case, Anglemeyer v. Ammons. Counsel. Good morning, Your Honor. Caleb Kruckenberg on behalf of the Anglemeyers. And if I could reserve three minutes, please, for rebuttal. Okay. And, Don, can you, I'm sorry, can you give me your pronunciation, your name one more time? It's Kruckenberg. Okay. Thank you, sir. You may proceed. Every aspect of the police response in this case was unreasonable. To investigate alleged drug dealing in an outbuilding of a large plot of land, the Pennsylvania State Police dispatched 43 officers in We're well familiar with the facts. So can I ask you, let's go, you know, each individual and their individual claims matter. Am I right that the claims that had once been made against Officer Shimp are no longer being pressed? Because it looks like those have not been pressed on appeal. That is correct, Your Honor. Okay. But as for Painter, Wysocki, Benson, McGarvey and Lopez, those are all still on the table. Yes, sir. Let's talk about who's with whom. This is like a game of Clue. And how many what's your position about how many officers use physical force against Jeffrey? And how do we know that? Because Jeffrey says it was a single officer who did everything. But the officer's testimony seems to suggest that multiple officers with different people. So are you asking us to disbelieve your own client's statement on this? No, Your Honor, I'm asking. Well, I'm asking this court to simply ask if a reasonable jury could decide on that record if multiple officers were involved. And I think what Jeffrey testified to is he believed it was the first officer that took him down, did everything. But we know from Officer Lopez. So just identify who we're talking about. It's Jeffrey and Officer Lopez and Officer McGarvey. And so Officer Lopez said that he was the one who put cuffs or flexi cuffs on Jeffrey's hands. He says he cuffed a man. A man. We know that that man is Jeffrey, not Richard. So Officer Lopez and Officer McGarvey both testified that they interacted with the man in the kitchen. And Officer McGarvey confirmed that he was not a senior citizen. He was a middle aged man in the kitchen. And Jeffrey testified. Jeffrey was in his his 50s. He's in his underwear. He's in the kitchen. His father, Richard, was in the living room. He's that would put Benson with Jeffrey. No, you're saying Benson goes with Richard. Yes. But why couldn't Benson have gone with Jeffrey? Because the testimony, I believe it was from Wysocki. Let me again. It's sort of difficult to follow who was with who. But if we look at Richard. I know he testified. So Benson testified that he interacted with a man in the next room. That was that was what he said. And then Officer Pollack testified that he went to the other bedroom on the ground floor, interacted with the other man. And then Officer Shimp said that Officer Benson went into the other room from the kitchen. So by process of elimination, we can say that that is the living room. That's with Richard. So Benson has to be with Richard in the living room. Yes. And Lopez has to be with Jeffrey in the kitchen. Yes. OK. But so how do we know, you know, your brief suggests McGarvey initially pushed Jeffrey down and Lopez cuffed him. But Jeffrey says the same officer who clotheslined him, which doesn't sound like it's classic football clothes lining, also stomps on his neck and zip ties him. So how do those two stories fit together? Well, if we're looking at the testimony and we're reading it in the light most favorable to the plaintiffs. OK. Then we have Jeffrey saying, I believe it was the same officer. We have two officers saying, actually, the first officer, I took him to the ground. And then Officer Lopez saying, I am the one who put cuffs on him. As Jeffrey says, the officer put cuffs on me, the one who pulled up on me. He slapped me. He did these additional actions once I was caught. But the difficulty is you have to identify which person pulled him up by the cuffs and slapped him around. And McGarvey story is that he pushed Jeffrey down and then used the shield to hold him down. He doesn't see anything about slapping around and putting his foot down. And Lopez says he cuffed him. Neither one says anything about slapping around or putting a foot on the neck or stomping him. So how can you tie it to either one? Well, we know it was the two officers were interacting. Right. But Joukowsky says you have to have enough that a reasonable jury could find it was this officer rather than that officer. What allows a reasonable jury to find you want to say? I think that it is Lopez who did the slapping and stomping, I think. Yes. What would allow a jury to find it was Lopez? Because Jeffrey testified that the officer who put him in cuffs was the one who did the additional acts. Right. But Jeffrey also testifies that the same officer did everything to everybody. So you're saying a reasonable jury could disbelieve all these other parts, but then stick with your stick with the one officer as to this. But that one officer, I mean, McGarvey has to be in there somewhere. So I'm just trying to understand why a reasonable jury would reject these other pieces, but then keep the identification as to Lopez, as opposed to saying once we get past one officer, we're not sure whether it's McGarvey or Lopez. We have to be 51 percent sure. Well, I don't think it's that unreasonable. We're not asking them to reject Jeffrey's testimony. I think it would be completely reasonable for a jury to say in that context, he wasn't sure. He says, I think it was one person. And they could say, well, he's faced down with a ballistic shield on his back and he was cuffed and then he was abused by one of these two officers. We don't necessarily have to think he's lying. They're wearing helmets and shields on their faces as well. Yes. So they might forgive him for that. But if I can, I'd like to shift gears and talk about Ida for a minute or Ada. Ada. She is one of the first people confronted. Officer Painter confronts her according to her story. As you put it graphically, you know, she's knocked down, badly injured. But according to the officer's story, she's she's blocking an entrance to a house where, according to the facts, and I know some of the facts are disputed. But a great number of a number of them are are undisputed. In this paragraph 18, you dispute some of them, but not all of them. I think you said the ones that weren't weren't opinion you agreed with. So this isn't opinion. There were numerous guns inside the residence. This isn't opinion. Those weapons include an AR-15. This isn't opinion. Mark Engelmeyer had a criminal record, including charges for assault and resisting arrest. Jeffrey Engelmeyer had an extensive record, including a record for assault, resisting arrest and strangulation. Rene, his sister, had an assault charge. Joseph Kluska had an assault charge. These are all things that appear to be admitted. So if you're going into this house under circumstances where, you know, and at least they believe that these folks are hostile to law enforcement. How could it how could we say it is clearly established that you can't get in the house quickly, even if grandma's in the way? And I buy that. I don't mean to be disrespectful to Ada. I'm just saying you have played up the fact that she's an older woman. There she was, an older woman, like in her 70s, in her nightgown. They should have recognized older woman. You don't hurt this lady, but they have a dangerous circumstance. Is it really the case that if you put a child or you put grandma in the doorway, you can't move her out of the way quickly, even if it turns out there's an injury? Well, Your Honor, I don't think that is what the testimony suggests, that she's standing in the doorway, certainly not the external doorway. What she testified to is she came out of her bedroom. She took a step out of her bedroom before the officer hit her and knocked her down. I understood her to be in a doorway, and it sounds like you're not disagreeing with that. No, Your Honor. And that their obligation is to clear the house. They don't know what's in the house. They don't have a floor plan for the house. They just know that there are multiple adults, multiple guns, people who have records for behaving dangerously. And one of the people comes to a door and is blocking the door. Is it clearly established in that kind of chaotic circumstance that you can't move a person forcefully out of the way? I think it is at least clearly established that you have a nonthreatening person who's not saying anything, not doing anything threatening, who appears unarmed without any warning, advance warning by the officer. You cannot then strike her down and throw her onto the ground. Well, it may be a fact issue, but of course Painter's statement is he did warn her and she didn't act. She stood in the doorway. And that is for the jury to resolve. Right. There's a fact question there. But even if one assumes that he said nothing, is it beyond the pale for him to move her out of the way? Are we dealing with a I guess another way to ask this is do we have a do we have an eggshell plaintiff here where if you if you if you bump the younger person out of the way, you know, you wouldn't have these level of injuries. But if in the chaos in the early morning, because it's very early still, I think the testimony I don't think it's disagreed that it's dark outside. Yes. And maybe kind of dark inside that you wouldn't know this is an older person. You just got to get them out of the way. Is that is that an unreasonable act? Well, first of all, I don't think that's a fair characterization of her testimony. What she said and the officer said I was just moving her out of the way with the shield. What she said is he struck me in the face. He broke my teeth. Well, struck her in the face. I don't think she disagrees that he he hit her with the the shield he had. Right. Correct. I don't think actually I don't think there's a dispute there at all. He's saying I'm moving her out of the way. She describes it as a forceful hit. He says I'm moving her out of the way. Everybody seems to agree he's moving her out of the way and it's and it's not gently. The point I'm trying to press you on is qualified immunity is supposed to protect officers except when no reasonable officer would do what they did. On this point. Help me understand. Is it beyond the pale with no reasonable officer in the early morning in the dark in a house where things are dangerous? Push somebody even forcefully push somebody out of the way who's blocking a doorway. And I think, Your Honor, if we look at the Cowden case and other cases where we're talking about an unprovoked law enforcement use of force on a noncompliant cooperative unarmed person, it is unreasonable. It is clearly established that that's unreasonable. So you're you're you're hanging your hat on compliant. And maybe that's the challenge, right? Like, what is compliant mean under those circumstances? What's the obligation the police have when they're in a dangerous circumstance? Do they have to wait, have a chat with the person or can they act if somebody if they perceive somebody is in the way and there's a threat underway? Well, and and I think crediting her testimony, she said, I took a single step out and did nothing else. There's not even an opportunity to be compliant in that circumstance. And your honor, I would ask to reserve some time. You have it. I have one more question before I let you go. So your your understanding is that McGarvey did the initial force against Jeffrey and then Lopez did everything else. So let's assume that Officer McGarvey knocked Jeffrey to the ground and then used his shield to control him, pushed him down with it. But then everything else was done by Lopez. If Officer McGarvey did not have any further contact with Jeffrey, did that forceful shove to the ground of someone who wasn't yet cuffed or restrained constitute excessive force? It is our position that it did. And for the same reason, because Jeffrey, again, had no opportunity to comply. He was just standing in the kitchen. He was unarmed. He was not threatening. He was not. I mean, he was obviously unarmed. He's saying there is underpants. And the officers, according to his testimony, gave him no warning, gave him no instructions. They just knocked him to the ground. I have a question, too. When we have these cases, we talk about, from the police perspective, the element of chaos and the split-second nature of the confrontation. Does that also apply on the other side? For example, Ada, I don't know if I were half-dressed in my bedroom at 5 in the morning because the police were using the element of surprise, if I would understand what was happening to be able to comply to a request or to a command. Does the split-second nature of the confrontation apply both directions? Absolutely. And I think it's important to remember the police broke through the windows and came into the house and, according to the witness testimony, did not announce who they were. So you have Ada waking up before 6 to a loud noise. Her husband thought the house was on fire. And then she is, the first thing she knows, she's struck by the shield. Thank you. Thank you. We'll have you back on rebuttal. We'll hear from counsel for the defendants. Good morning. May it please the Court. I'm Claudia Tesoro. I'm from the Attorney General's Office, and I'm representing the athletes, of course. Okay. I want to start with you with Ada as well. Here's how they describe things, and this is just an example. Now, at least this much is agreed, right, that Officer Painter knocked this 76-year-old 5'2 woman to the ground almost instantaneously, right? Yes, but I think that you have to read that against the plan to keep the people under control, and she wasn't supposed to be out of her room. Thank you. You go right to my point. Is the fact that the police perceive this to be a dangerous circumstance, does that entitle them to rough people up immediately? In other words, this is dangerous, we're not sure what we're going into. Because it's dangerous and it may be chaotic, it's okay to knock a 76-year-old woman to the ground with a ballistic shield without giving any significant, even if he said something, it would happen just like that. I think everybody agreed just like that. Does the police perception that they're going to enter a dangerous circumstance allow them to start knocking people down immediately and roughing them up? Well, I think that... That happens, right? Richard gets hit in the head with a flashlight. Jeffrey gets knocked down with a boot on the back or a shield. Ada gets her nose broken and verba shattered by getting shoved back the minute she steps out her door. All that happens just almost instantaneously, correct? I don't know if we know exactly when any specific contact happened. But, yes, the whole event happened over a relatively short period of time. I don't think they just charged into the building and started hitting people, though. They had to find their way through. That's at least the factual dispute. There's at least the factual dispute about that. A bunch of it, I would say, is not even disputed. As I read the record, it didn't sound to me like Officer Painter was saying, yes, we chatted for a couple minutes, I knocked on the side, I said, please, please, Ms. Engelmeyer, move out of the way, but she wouldn't do it. No, it was, I told her to get down. She said, I didn't hear anything. But almost immediately, shield in the face, knock you over, literally break your back. That doesn't seem to be disputed. But even if I accept them as sort of that there was something else going on there, it sounds like that's a factual dispute. And wouldn't that be a factual dispute that would have a significant bearing on our jurisdiction to decide this qualified immunity issue? Or is it so clearly established that you can go into a house and start knocking people around that we should say, well, yeah, they perceived it was dangerous. It's all good. I think the problem I'm having with your summary is that it zeroes in on one piece of this bigger event and it doesn't explicitly take into account the background that the situation was dangerous in general. But the state police were called in to help secure the house so that the search warrant could be carried out. And to do that, they had to find their way through the hallways or whatever they were. I'm giving you all that. That's why I start out by saying, is it okay if they perceive there's danger for them to immediately start knocking people over? That's the hypothetical I'm giving you. And I guess it's not hypothetical because that appears to be what happened. Is it the government's position that if the police perceive it's dangerous, they can go in and start knocking people over, breaking noses, whacking them on the head, pulling them up, zip-tying them, slapping them in the face? If that's all true and there's factual disputes in there, but if that's all true, are you saying that's good because this was dangerous? No. I'm not saying it in that narrow way. I'm saying that the police had a scenario that they were experiencing and were directed to experience, and they all have testified and the facts were laid out in the record about what happened when and what happened here, what happened there. It was a little bit less zeroed in than you're describing. Now, the encounter with Ada, there's no question that's the hardest thing to condone because she did get hurt. Not just because she got hurt. Imagine she was the spryest 76-year-old in the world and she bounced right back up or she was made of rubber. It's still not okay to knock somebody down when they step out of the door in their nightgown at, what, 6 a.m. in the morning being awakened by a noise, is it? Well, I think yes. In the circumstances, it would be. It would be. Because the whole picture was of an altercation. They thought it was dangerous. They had. So knock down Grandma. No. Excuse me. The first time you talked about it, you said something like she wasn't supposed to be there. What did you mean by that? I don't remember saying that specifically. I think what I was trying to convey is that the purpose of the officers fanning out in the house where there were quite a few people living, not just Ada, is to make sure that everybody was where they belonged, so to speak, in their room, if that's where they were, and stayed there and didn't come out and wander around when complicated other things were going on around them that could get anybody into a bit of a pickle. I think we have to accept that because she had been asleep, she had even less idea than the rest of them probably what was going on. But the fact is she was up and around and had left her room, and she needed to be controlled just like everybody else did. Unfortunately, she was already out of her room, and she had to be brought back, and we know how that occurred. He could have said, back in the room, right? Police officer, he's got the shield, he's got the mask. Don't you think that might have been sufficient? Well, maybe, but I don't think you can get down to that narrow theoretical possibility to say that this is a triable situation. All right, so there's a range of conduct. Back in the room, push her aside gently, push her aside forcefully, bash her in the face with the shield, breaking her teeth and neck. I mean, that's what we're trying to figure out, where the line is, right? Well, yes, but the problem we have with her in particular is that he says he told her what to do, and she says no, but she didn't hear it. And that's a fact issue, right? It's a fact issue, but what happened right before and right after really isn't a fact issue. The facts are clear. Okay, if the facts are clear, and the facts are he hit her with sufficient force to break her teeth, to break vertebrae in her back, to knock her to the ground, under these circumstances, the Commonwealth's position, the officer's position is, yeah, that's reasonable. It's completely reasonable to surprise an old woman in her nightgown. Well, I don't think that's what we're trying to argue. Here's the way you put it in your answering brief. You say, no clearly established law holds that residents of a 60-acre property being searched who must be controlled amidst the chaos around them cannot be touched by searching officers. Is it really the case that the argument being made by the other side is we couldn't be touched, or is the problem here not that they couldn't be touched, but that they were very violently and immediately touched, like violently, aggressively, and immediately controlled? I don't think that the record and the hundred and whatever paragraphs of facts that got this ball rolling are that elaborate about the immediate and violent and so on. I guess we could go through the record, but as I read the record, the whole point was be fast, get in there, do it as quickly as possible, and that, in fact, that's what they did. They went in. They immediately knocked Ada to the ground. They immediately controlled Richard. His statement is, I literally didn't know what hit me. He was knocked to the ground, and that's what provokes Jeffrey. Now, I'll repeat. If you disagree that that's what happened, then we've got a fact issue. But if you don't disagree with what I've just said, then your position has to be that's reasonable police behavior. Well, I think I'm not saying that it's everyday reasonable for everybody, but I'm saying under this scenario, with this operation, with this set of additional details that set the stage for the entire problem, yes, it's not unreasonable. Police have the discretion and the authority, and sometimes they do use force. We know that. And sometimes they don't. They have to use force. Nobody's questioning that. But I guess your argument is boiling down to totality of the circumstances. The police were afraid for their safety. So what they did was okay. Would your argument be, well, whatever they did would be okay because of the totality of the circumstances. They could have gone in with guns out shooting. That would be okay. No, I'm not saying that. Okay. So there's a line. You've got to agree there's a line, right? Well, on any given moment in any given scenario, I guess you could say there's a line. But what I'm trying to convey is that the whole operation was meant to be efficient and effective. And fast. And relatively fast, but not meaning that it would all be accomplished in a second because the people had to be restrained while the local police did what they were doing. It wasn't going to take five minutes to do that. You make a lot in your argument about the fact that the plaintiffs were making inferences from circumstantial evidence and your point to conclusions from the district court about the lack of identification, if I remember correctly. But you also admit and embrace certain quotations from the plaintiff's statement of facts, which if I were you, I'd have done the same thing, where they acknowledge or seem to say, hey, I couldn't recognize this person because they were wearing masks and helmets, et cetera. So since the police go in with shields, with helmets, with face masks, with no names, what are people left with other than circumstantial evidence? What's wrong with relying on circumstantial evidence and a reasoning with a process of elimination to get to a statement that it needed to be this person or it was these two people together? I'm not sure I've said there was something wrong with doing that. I don't think there was a choice. I agree with you on that. Okay. I perhaps misunderstood your argument, which was that the district court was right to say they weren't able to do this particularly and they did it on circumstantial evidence. But if you're not arguing that point, that's fine. So you're saying that is okay. If they've got circumstantial evidence and they can use a process of elimination and they can identify people, you'd acknowledge that's all right? Well, but they didn't. After an extensive discovery, they still had gaps in what they were able to assert about some of the plaintiffs. Explain the gaps. What are the gaps? Well, to work backwards, the Richard and Jeffrey situations involved, excuse me, the Jeffrey situation named several defendants, McGarvey, Shimp, and Lopez. Now, Shimp, I think, is out. We've agreed. But it's still two people. It's McGarvey and Lopez, those two. And if by the end of the discovery process, which was extremely extensive, they haven't been able to narrow down who did what. Well, when you say who did what, we've got two people. Jeffrey thought it was one person, but McGarvey and Lopez's testimony indicates that it might have been the two of them. Why isn't it possible for a jury to do just exactly what Mr. Kruckenberg said and say, well, when you're face down with a boot on your neck or a shield on your back, you may not know which of the two is doing it, but it's those two. Why is that an unreasonable thing for a jury to deal with an address? I think that there may be a problem, actually, in how the questioning went on at the various depositions and who else was asked about what and who else might have been nearby and so on. If there were gaps in the record that the plaintiffs, through their efforts, could have delved into and clarified, they should have done it. Well, so you're asking for a level of precision where it can't just be a reasonable inference that a jury could draw. It has to be a more likely than not thing that comes out of the record. Well, I'm trying to explain that if, after all the extensive opportunities for discovery that they had, they have not narrowed it down and they go to trial and they say, well, we're still not really sure, but it was easier. Is that where the rat just went in the hat when you said they have not narrowed it down? Because their position is they have narrowed it down. Well, they narrowed it. As did Jeffrey, who's the only one we're talking about where there's two people involved. He's narrowed it down to two people. And one of them, he thought one of them did it all, but maybe two people did it. Based on their testimony, maybe it was two of them. I'm saying, and if we want to focus on that, by the time the discovery had closed, it was up to him to decide who he was accusing of what. And he had every reasonable chance in the world to delve into that with the people involved. He deposed everybody. Why can't he say, well, I thought it was one person, but okay, if you both say you're involved, I'll take that. Both of you did it. Why can't he do that? Because that's not how civil litigation works. No, on the contrary. That's exactly how civil litigation works. You can say to the other side and you can say to a jury, and I imagine if this gets to a jury, Mr. Krekenberg will say to a jury, you know, his face was in the ground. So maybe he didn't know exactly who was doing what when, but you can know who was doing what when because listen to what they say. Listen to what they say. That's what juries do. What do you mean when you say that's not how civil litigation works? What I meant was that the process of figuring out who you're going to sue in the first place and who you're going to go after in discovery and who you're going to name in which capacity at the motion stage, if there is one, is all controlled by the parties and the lawyers. And if you get to the end of that stage and you have not figured out who you are accusing of harming you, then you don't have enough to get to a jury. Well, maybe I could just ask this one last one and then ask my colleagues if they've got anything for you. What kind of an incentive structure do we set up if we say, hey, police, if you put on shields over your face and you wear helmets and you hold a shield in front of you and you have no identifying marks at all and you go in like storm troopers and you attack people, don't worry. You can never be held responsible because nobody can ever identify you. Is that the logical end of where you're going? I don't think so because... Why not? Because most rational police departments would not go to those lengths unless there was a reason. Yours did go to those lengths. That's how they went in. Now, you could say, I don't like your editorializing with the attack, et cetera, et cetera. But they went in with no identifying material on. They went in in tactical SWAT gear. They went in obscuring their faces, obscuring their heads, using shields in front of them, all for perhaps legitimate reasons. But what kind of incentive structure do we set up if we say, yeah, that's the law. You can go in looking like the storm troopers out of Star Wars. No one's going to be able to identify you. But don't worry because they can't identify you. You can never be held responsible. I don't think that that's what we're saying, and I don't think that's what you should say or any other case should say. You have to look at the specifics. And I just want to add one tiny detail about the lack of name badges. That was a standard policy, apparently. I'm sure the tactical gear was a standard policy. I'm trying to ask you what happens to the law if we rule the way you want us to rule? What incentive does that put in place? What does that tell law enforcement? If no one can tell who you are, you can never be held responsible. I really don't think that that would tell them that, and I think that would be an incorrect conclusion to draw from this. It would be an unfortunate incentive to put in place, wouldn't it? It probably would, but I don't think that's what was happening or should happen. Okay. Do you have anything? No. All right. Oh, I'm sorry. Thank you. Mr. Kruckenberg. Your Honor, let me just start with the identification issue. And one point I just want to bring up about the Jatkrowski case, or I'm not sure how to pronounce it. Really, that's the case that we're talking about, where we're trying to figure out how over the line we are. And I think one important point to recognize about that case, there was one act alleged and five people that were there. And this Court said, I think really critically to the analysis, is that we know that four of those people are free of liability. And we can't just say, well, the jury can roll the dice. But that's not what we have here. As you pointed out, we have a very clear idea of who was where, and it's about their actions. Right. And we're familiar with Jatkrowski, but can you speak to Ms. DeSoro's point, as I understand it, that you could have done more to identify these people. You, for whatever reason, didn't pursue the ambiguities in the record, and that should fall on you, you meaning your clients, I'm sorry. If Jeffrey is unable to say who it was, that's on Jeffrey, who had ample opportunity to find things out and didn't. And so Officers McGarvey and Lopez ought not be held responsible for the inability or unwillingness of Jeffrey to use the tools he had available to him in discovery to do with relative precision what Jatkrowski requires, which is identify the person you say harmed you. Well, I think, Your Honor, Jeffrey and everyone else in discovery did their very best. Obviously, we want to know who was involved, and part of it is how hard it is to figure that out, because of the way they were dressed, because of the number of people there. And it's not like they knew their names. Jeffrey just knew. I was thrown down by one officer. I thought, and then we learned in discovery there were actually two officers involved. It is not, I think, reasonable to expect every plaintiff to be able to reconstruct every event, because there are certainly circumstances where it's impossible for a plaintiff to know who it is that's attacking them or who it is that's committing misconduct. And discovery, we can narrow it down, and what we've done here is we've created enough evidence that a jury can reasonably conclude who did what. And that's all we're asking for is the opportunity to present that to the jury. They can figure it out. They can decide what actually happened. You've relied on Cowden for the proposition that, as you said in the brief, a police officer's unprovoked attack on a cooperative and unarmed subject is excessive. But for some of the plaintiffs, let's say Ada and Richard, maybe it was unclear whether they were cooperative and unarmed before they initiated contact. So how does Cowden apply in instances where it's objectively unclear whether the individual is armed or cooperative in the way that the policeman expects them to be cooperative? Well, Your Honor, a police officer can't circumvent the opportunity for cooperation. And both Jeffrey and Ada said, I had no opportunity. Nobody gave me any instructions. I was standing there doing nothing. I was taken down. And so if you could just get away with saying, well, you didn't cooperate because I didn't give you a chance, then that's the same outcome. And, Your Honor, just to bring up Mr. Kluska, we haven't talked about him, but, again, that is a, you know, when we're talking about chaos and all these other sorts of things, I don't think there's any dispute that his testimony, he was handcuffed, he was gratuitously injured by an identified officer when he was handcuffed. And respectfully, Your Honors, we're simply asking for an opportunity to go to trial. Thank you. Okay, thanks. We've got the matter under advisement.